ISAAC L. MORRISON *et al.*

*v.*

FLORA O. SMITH.

*Filed at Springfield November 1, 1889.*

1. ALLEGATIONS AND DECREE—*must correspond.* A decree can not be sustained unless it is based upon the allegations of the bill. If a party makes one case by his bill and an essentially different one by his evidence, he can not recover, however meritorious the case proved may be.

2. SAME—*whether there is a variance—where one of several grounds of relief is satisfied.* A bill in chancery to set aside an assignment of a judgment alleged two grounds of relief: First, that the transaction was a loan, and the assignment was made as a security, only; and second, that the assignment was fraudulent, for the reason that the assignees were the attorneys of the assignors, and the transfer was made at an inadequate price. The court found there was no loan, but a sale and purchase, and set aside the sale on the ground of the inadequacy of price: *Held,* that there was no variance between the bill and the decree, as the bill presented a two-fold aspect, seeking relief on two different grounds, one of which justified the decree.

3. DECREE—*sufficiency—in finding the sum to be paid.* On a bill to set aside the sale and assignment of a judgment on the ground of the inadequacy of the price paid therefor, the court, in its decree, found that the complainant was justly chargeable with $275 due the defendant, and directed the payment of that sum, with interest thereon at the rate of six per cent from a day named, being the date of the assignment: *Held,* that while the decree was technically erroneous, in not finding the sum to be paid including the interest, yet as the dates were given, so that the amount due rested only in computation, the error was an immaterial one, and the case was within the rule which treats that as certain which is capable of being rendered certain.

4. INTEREST—*at what rate—as determined in a decree.* A bill sought to redeem from a sale of a judgment, on the ground the assignment was in the nature of a security for the loan of money to the assignor at eight per cent, and also on the ground of fraud and inadequacy of price. The court found that the transaction was an absolute sale, but that it was fraudulent, on account of the inadequacy of the consideration, and decreed that the sale be set aside upon the complainant paying the defendants the sum found due them, with six per cent interest. The complainant, in his bill, offered to pay the amount of the alleged loan, with eight per cent interest. The defendants claimed that there

was error in not requiring complainant to pay eight per cent interest: *Held*, no error, as, on the finding of the court that there was no loan, the consequences flowing from the theory of a loan were eliminated from the case, and as the court found the transaction to be a sale, no interest was recoverable except at the rate of six per cent.

5. ATTORNEY AND CLIENT—*dealings between them—burden of proof as to fairness.* The relation of attorney and client being one of special trust and confidence, the law requires that all dealings between them shall be characterized by the utmost fairness and good faith, and it scrutinizes all transactions had between them. So strict is the rule, that dealings between them are held, as against the attorney, to be *prima facie* fraudulent, and the burden is not upon the client to establish fraud and imposition, but it rests upon the attorney to show fairness, adequacy and equity.

6. An attorney who bargains in a matter of advantage to himself with his client, is bound to show that the transaction is fair and equitable ; that he fully and faithfully discharged his duties to his client, without misrepresentation or concealment of any fact material to the client; that the client was fully informed of his rights and interests in the subject matter of the transaction, and the nature and effect of the contract, sale or gift, and was so placed as to deal with the attorney at arm's length.

7. It has been held in some cases that all such transactions are voidable, at the election of the client, but the weight of authority does not go that far. There is no necessary incapacity for dealing between client and attorney, and while transactions between them will be closely scrutinized, yet those which are obviously fair and just will be upheld.

8. ADEQUACY OF PRICE—*in case of a sale—and herein, as to the mode of determining values.* In determining whether property sold has brought an adequate price, the ordinary inquiry is as to its market value. If there is no established or ascertainable market value, it is proper to inquire as to what purchasers would be likely to give for the property if given a fair opportunity for competition.

9. SAME—*adequacy of price on the sale and assignment of a judgment.* The holder of a judgment for $716 sold the same for $275, to her attorneys. The debtor was a non-resident, and insolvent, and the judgment was a first lien upon his undivided one-fifth interest in a tract of one hundred and sixty acres of land, subject to a life estate of his mother, aged sixty-one years. The value of the undivided one-fifth of the land, without the incumbrance of the life estate, was from $1600 to $1760. The court, in determining the value of the judgment, ascertained the value of the remainder, held by the debtor, by deducting from the value of the fee the estimated value of the life estate, such estimate being made upon the basis of the probable duration of the life

of the tenant, as shown by the tables recognized by the courts as authentic. This made the value of the debtor's interest something more than the face of the judgment: *Held,* that such rule might be proper when the life tenant is willing to relinquish the estate, and take in lieu thereof a just and equitable proportion of the entire value of the land; but in this case, where the life tenant was not bound to part with her estate, the course adopted would establish a criterion of value both unjust and delusive.

10. Where the value of a judgment depends upon the value of the debtor's interest in land which is subject to a life estate, and there is no means of extinguishing the prior estate without the consent of the life tenant, by paying its estimated value computed according to the tables, the uncertainty of the length of the life tenant's estate, and her right to the exclusive possession and enjoyment of the land, would render the value of the judgment very uncertain, and deter prudent persons from purchasing, except on the probable continuance of the life estate at its extreme limit.

Appeal from the Circuit Court of Morgan county; the Hon. Cyrus Epler, Judge, presiding.

Messrs. Morrison & Whitlock, *pro se :*

There is a variance between the allegations in the bill, and the proof. The bill charges that the transaction between appellants and appellee was a loan of money. The evidence clearly shows that it was a sale. It is a principle of chancery practice that a party "must recover, if at all, according to the case he has made in his bill." He can not state one case in his bill and make out a different case in proof. *Ohling* v. *Luitjens,* 32 Ill. 23 ; *McKay* v. *Bissett,* 5 Gilm. 505 ; *Morgan* v. *Smith,* 11 Ill. 194 ; *White* v. *Morrison,* id. 361 ; *Shankland* v. *Shankland,* 115 id. 526 ; *Scott* v. *Harris,* 113 id. 447.

The court should have found the amount due from appellee to appellants, and decreed the sum to be paid. The court found there was due from appellee to appellants $275, with interest at six per cent per annum from the 6th day of April, 1885. But who, under this decree, is to compute the interest, and how is it to be known how much money the appellee is to pay and appellants to receive ? *Wilhite* v. *Pearce,* 47 Ill. 413.

The court should have required the payment of interest at eight per cent, according to the tender in the cross-bill.

An attorney, in this State, is not prohibited from dealing with his client, when the transaction is fair and honest, and in no manner tainted with fraud, undue influence or corruption. *Hess* v. *Voss,* 52 Ill. 481; *Laclede Bank* v. *Keeler,* 109 id. 385; *Nesbit* v. *Lackman,* 34 N. Y. 167.

The proof shows that the purchase of the judgment was fair, and free from any fraud or undue influence, and fails to show that the price paid was not the fair value of the judgment.

Mr. JOHN W. SPRINGER, for the appellee:

The decree is not variant from the relief sought in the cross-bill. It fixes the amount to be paid by appellee.

The court having found that the transaction which the appellee thought was a security was in fact a sale, and no interest being expressed, six per cent was all she was responsible for.

The *onus* is on the attorney to show fairness, adequacy and equality. *Jennings* v. *Connell,* 17 Ill. 150; *Yeoman* v. *James,* 27 Kan. 198; 1 Story's Eq. Jur. note 1, p. 346.

When two parties stand toward each other in any relation which necessarily induces one to put confidence in the other, and gives the latter the influence which naturally grows out of such confidence, and a sale is made by the former to the latter, equity raises a presumption against the validity of the transaction. *Howell* v. *Ransom,* 11 Paige, 538; *Condit* v. *Blackwell,* 22 N. J. Eq. 481; *Porter* v. *Woodruff,* 76 id. 174; *Farmer* v. *Farmer,* 39 id. 211.

When the attorney or solicitor of a party becomes the purchaser, he occupies the position of the party himself, and although he may design the purchase for himself, the client may claim it to his own use. *Moore* v. *Brocken,* 27 Ill. 27; *Zeigler* v. *Hughes,* 55 id. 202.

As to the value of the life estate, we establish that the one hundred and sixty acres of land was worth $55 per acre in

1885, and that Mrs. Smith was sixty-one years of age at that time. It is therefore a mere computation, which the law itself makes, as to the value of the life estate. Puterbaugh's Ch. 487; *Sutherland* v. *Sutherland*, 69 Ill. 481.

The tables showing the probabilities of life, by which the value of dower rights can be computed, are recognized by the courts as the proper means of proving such value. *McHenry* v. *Yokum*, 27 Ill. 161.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This was a bill in chancery, brought by Isaac L. Morrison, Herbert G. Whitlock and Flora O. Smith, against Samuel Smith and James F. Rearick, for the partition of the northeast quarter of section 28, township 15, north, of range 9, west, in Morgan county. After the original bill was filed, Flora O. Smith had the bill dismissed as to her, and on her own motion she was made a party defendant, and filed her answer and cross-bill. The only controversy in the case arises upon that part of the decree which is based upon the cross-bill.

It appears from the pleadings and evidence that on the 3d day of February, 1868, Robert R. Smith died intestate, leaving him surviving Ellen Smith, his widow, and Samuel Smith, Sallie Smith, afterward intermarried with James F. Rearick, Meredith L. Smith, Elmer Smith and Flora O. Smith, his children and heirs at law; that said Robert R. Smith, at the time of his death, was seized in fee of the land above described, and various other lands; that said quarter section of land was assigned to said widow as her dower, the residue of said lands having been duly partitioned among his children. It thus appears that the five children of Robert R. Smith were tenants in common of said quarter section of land, subject to the life estate of said widow. Sallie Rearick died, leaving a will by which she devised her interest in said land to her husband, James F. Rearick. On the 10th day of August, 1887, the life estate of Ellen Smith was terminated by her death.

The bill, which was filed after the death of said widow, alleges that, at the time it was filed, James F. Rearick was the owner of an undivided one-fifth of said tract of land by devise from his wife; that Samuel Smith was the owner of one-fifth, Flora O. Smith of one-fifth, and that the shares of Meredith L. Smith and Elmer Smith had each been sold under judicial process and their title thereby divested, and that their shares had passed, by means of said sales, to Isaac L. Morrison and Herbert G. Whitlock, as copartners under the firm name of Morrison & Whitlock, and that they had thereby become and still were the owners of the undivided two-fifths of said tract of land in fee. This appeal involves only the one-fifth interest formerly belonging to Elmer Smith.

It appears that some time in 1884, Flora O. Smith, having a claim against her brother Elmer Smith, brought a suit in attachment against him, and caused the attachment writ to be levied upon his interest in said tract of land. Morrison & Whitlock, who were attorneys and counselors at law, acted as her attorneys in commencing and prosecuting said suit, and obtained a judgment in her favor in November, 1884, for $716 and costs. In April, 1885, and before the sale of the property attached on special execution, she executed to her said attorneys an assignment of said judgment, and received from them the sum of $200 in money. Morrison & Whitlock thereupon caused the interest of Elmer Smith in said land to be sold on special execution, and they themselves became the purchasers, bidding therefor the full amount of the judgment. Said interest in said land not being redeemed from said sale, was subsequently conveyed by the sheriff to them. The evidence shows that at the time of said sale said land was worth from $50 to $55 per acre, which would make the value of an one-fifth interest, if unincumbered by the life estate of the widow, from $1600 to $1760.

In her cross-bill, Flora O. Smith insists that the transaction which resulted in the assignment of said judgment to her at-

torneys, was one which should charge them as trustees for her.
Her allegations on this point are, in substance, that she was
desirous of obtaining a loan of money, and applied to them
for the sum of $200 as such loan, and that they thereupon
loaned her that sum, and that she, at their request, assigned
to them said judgment, such assignment being by way of giv-
ing security for said loan, and for no other purpose; that she
was of tender age and wholly without experience in business
matters, and without knowledge of legal affairs, or the legal
effect of the transaction; that they sustained to her the rela-
tion of attorneys and legal advisers, and that she had implicit
confidence in their ability, probity and fairness, and relied
upon them to look after her legal interests. Said cross-bill
also contains the following allegation:

"Your oratrix states that said Morrison & Whitlock's title
to said interest is fraudulent, because they hold it simply to
secure the money and interest thereon advanced by them to
your oratrix, and also because, if it were the intention of her
said attorneys to regard such transaction as a sale and pur-
chase, the price they paid for said interest was grossly inade-
quate."

Morrison & Whitlock, in their answer to the cross-bill, admit
their relation to Flora O. Smith as her attorneys, and that as
such attorneys they commenced and prosecuted said attach-
ment suit and recovered judgment therein, and there is no
pretense that such relation had terminated at the time the
judgment was assigned to them. They allege that, after the
recovery of said judgment, Flora O. Smith desired to sell
the same, as she was about to go to Colorado; that they
advised her not to sell it, but that she declined to take their
advice, and expressed a determination to make such sale; that
they made various efforts on her behalf to find a purchaser,
or some one who would advance money to her on the judgment,
but without success; that they thereupon bought the judgment
from her and paid her therefor the sum of $200, and released

her from all liability for fees and costs in the case, and that afterwards, on sale by the sheriff of the land attached, they bought it in their own names, as they had a right to do; that they bid the full amount of the judgment, said Elmer Smith being a non-resident and insolvent; that the value of his interest in said land depended upon the length of the life of his mother; that if she had lived, as she might have done, twenty or twenty-five years, it would not have been worth the sum bid, but as her death occurred so soon, it was worth more than the price paid; that by virtue of said sale, they became the purchasers and owners in good faith of an undivided one-fifth of said tract of land, and that the first intimation they had of a claim by Flora O. Smith that the transaction was a loan was derived from the averments of her cross-bill.

The evidence as to whether the real transaction between Morrison & Whitlock and Flora O. Smith was an absolute sale of said judgment or a mere assignment of it as collateral security for a loan, is conflicting. The testimony of Flora O. Smith tends to show that the transaction was a loan of money and that the judgment was merely assigned as security for its repayment, while the testimony of Morrison & Whitlock tends to support the averments of their answer, that it was an absolute sale. Upon this issue of fact, the court found in favor of Morrison & Whitlock, the finding of the court on this question being: "That Morrison & Whitlock, before the assignment was fully made, informed Flora O. Smith of all her interests, and advised her not to sell and assign the judgment; that after being fully so informed and advised, she did sell the same to Morrison & Whitlock for the sum of $200, they to pay the costs of suit and of sale, and to present no bill for services in the case."

The court further found the existence between Morrison & Whitlock and Flora O. Smith of the relation of attorneys and client in respect to said judgment; that at the time she assigned said judgment to them, she was but twenty years of

age and inexperienced in business; that said judgment was worth its face, and that the price for which it was sold was greatly below its value and to her disadvantage. The court thereupon decreed that said assignment be set aside, and that Morrison & Whitlock be decreed to hold said undivided one-fifth of said land as trustees for Flora O. Smith, subject to a charge of $200, the sum paid therefor, and $25 for the costs paid by them on the sale of the land, and the further sum of $50 which the court found to be justly chargeable for their fees and services, making $275 in all, with interest thereon at the rate of six per cent per annum from April 6, 1885, the date of the assignment, and it was further ordered that she pay to them that sum and interest within ninety days from the entry of the decree, and that upon such payment, they execute and deliver to her a deed conveying to her said undivided one-fifth interest in said land. A decree for the partition of said land in accordance with the interests of the several owners thereof established as above stated was thereupon entered, and Morrison & Whitlock bring the record to this court by appeal, and assign·for error so much of the decree as sets aside the assignment of the judgment and charges them as trustees for the appellee.

The first error assigned, is, that the decree is not based upon the allegations of the cross-bill. The rule undoubtedly is, that a decree can not be sustained unless it is based upon the allegations of the bill. If a party makes one case by his bill and an essentially different one by his evidence, he cannot recover, however meritorious the case proved may be. But while this familiar rule must of course be admitted, we think the allegations of the cross-bill in this case are sufficient. The variance pointed out is, that the cross-bill makes out a case of a loan of money and the assignment of the judgment as security, while the case established by the evidence and found by the decree is that of a sale of the judgment by the appellee to her attorneys, but at an inadequate price. It is true the

appellee alleges in her cross-bill that the transaction between her and her attorneys was a loan of money and an assignment of the judgment as collateral, but she also alleges in a subsequent part of her bill that Morrison & Whitlock's title to the one-fifth interest in said lands is fraudulent, because the price paid by them was inadequate. In this allegation is set forth, very briefly it is true, but in substance and we think sufficiently, the ground upon which the court granted relief. The bill may be treated in this respect as having a double aspect. It alleges that the transaction was a loan, and it has to that extent the character of a bill to redeem, but it also proceeds upon the ground of fraud, and alleges that Morrison & Whitlock's title is fraudulent because, during the subsistence of the fiduciary relation between them and their client, they obtained from her a sale of the judgment, if it was in fact a sale, at an inadequate price.

The next point made is, that the decree is erroneous in failing to compute the interest on the amount to be paid by the appellee, and decreeing the payment of the sum thus arrived at. Doubtless it would have been better and more in conformity with the usual practice, to make the computation of interest and decree the payment of the sum due at the date of the decree, together with the interest thereon from that date, and to that extent the decree must be held to be technically erroneous, but the error does not seem to be material, or one which, of itself, ought to necessitate a reversal of the decree. A mere computation of six per cent interest upon a given sum for a given period of time, involves a mathematical calculation which can lead to but one result. The failure to compute the interest, all the elements or factors which enter into the computation being fixed and ascertained, introduces into the decree no uncertainty as to the amount to be paid. When the appellee undertakes to comply with the decree by paying or tendering the amount she is required to pay the appellants, there will be no difficulty in determining whether the amount

paid or tendered is the proper one. That can readily be ascertained by either party by a simple computation. The case would seem to be within the legal principle which treats that as certain which is capable of being rendered certain.

Most if not all the. cases in this State where decrees have been held erroneous because of the failure of the court to compute the interest and order the payment of the sum thus ascertained, have involved elements which do not exist here. Thus, in *Aldrich* v. *Sharp*, 3 Scam. 261, a bill was filed to foreclose a mortgage given to secure $450 and interest thereon at the rate of twelve per cent interest per annum. The decree, which was by default, required the defendant to pay said principal sum, with twelve per cent interest, from the date of the mortgage to the date of payment, deducting therefrom the sum of $52.84. The decree failed to determine whether the credit of $52.84 was to be made upon the principal or the interest, or as to the date at which it was to be applied. On account of the uncertainty as to the time and mode in which the credit was to be applied and the consequent uncertainty as to the result of a computation of the amount due, and also of the fact that the complainant was permitted by the decree to recover twelve per cent interest as well after as before its entry, the decree was held to be erroneous and was reversed. In *Boston* v. *Nichols*, 47 Ill. 353, the error consisted in leaving it to the master, at a period subsequent to the decree, and upon a further investigation, to adjudge and determine the amount of a note which had not matured at the date of the decree, no investigation of that question being made by the court itself. *Wilhite* v. *Pearce*, 47 Ill. 413, involves substantially the same error, the court having there referred it to the master to ascertain the amount of a certain lien, without attempting itself to adjudicate upon that question. In *Smith* v. *Trimble*, 27 Ill. 152, the decree was reversed on other grounds, but it was also held that the court should have ascertained the precise amount required to be paid, and not left

it to computation. In that case no computation was made, and it is difficult to gather from the reporter's statement, whether the decree furnished the proper data from which a computation could be made. No one of the cases above cited is like the present, and we are unable to see how, upon principle, the failure to compute the interest, where, as in this case, the computation is simple and wholly free from complications, and all the elements which enter into it are fixed, can work any prejudice to the rights of any of the parties.

But it is claimed that the decree should have allowed the appellants eight instead of six per cent interest. This claim is based upon those allegations of the cross-bill in which the appellee alleges that the transaction between her and the appellants was a loan of $200 at eight per cent interest, and in which she makes a tender of the amount of such loan and interest at that rate. Doubtless if the appellee had succeeded in sustaining her allegation in that behalf, she would have been held liable to repay the loan with the stipulated interest. But her theory as to the transaction being a loan was contested by the appellants, and the court found that it was not a loan but a sale. If we assume that such finding is correct—an assumption of which the appellants certainly can not complain—the entire theory that the contract was a loan must be disregarded, and all the consequences flowing from such theory are eliminated from the case. The agreement to pay eight per cent interest falls with the supposed contract of which it was a part. The case must be decided upon the basis of the finding of the court that the appellee sold her judgment to the appellants, and the transaction being a sale, no interest is recoverable except that which courts of equity, proceeding upon equitable principles, will impose as a condition to the granting of equitable relief.

We now come to the most material question in the case, viz., whether the circumstances under which the appellee's judgment was assigned to the appellants were such as will

justify a court of equity in setting the assignment aside, and charging the appellants as trustees for the appellee in respect to the judgment and the lands seized and sold thereunder.

The relation of attorney and client which existed between the appellants and the appellee has always been regarded as one of special trust and confidence. The law therefore very properly requires that all dealings between an attorney and his client shall be characterized by the utmost fairness and good faith, and it scrutinizes with great closeness all transactions had between them. Meechem on Agency, secs. 877-879. So strict is the rule on this subject, that dealings between an attorney and his client are held, as against the attorney, to be *prima facie* fraudulent, that is to say, the burden is not upon the client to establish fraud and imposition, but the burden rests upon the attorney to show fairness, adequacy and equity. *Jennings* v. *McConnell,* 17 Ill. 148. As said by Mr. Weeks: "The attorney who bargains in a matter of advantage to himself with his client, is bound to show that the transaction is fair and equitable; that he fully and faithfully discharged his duties to his client, without misrepresentation or concealment of any fact material to the client; that the client was fully informed of his rights and interests in the subject matter of the transaction, and the nature and effect of the contract, sale, or gift, and was so placed as to be able to deal with his attorney at arm's length." Weeks on Attorneys and Counselors at Law, sec. 268.

The rules above referred to apply with great strictness to cases of purchases by an attorney of his client's property. It has been held in some cases that all such transactions are voidable at the election of the client, but the better rule, and the one established by the preponderance of the authorities does not go so far. There is no necessary incapacity for dealing between client and attorney, and though transactions between them will be closely scrutinized, yet those which are obviously fair and just will be upheld. In *Laclede Bank* v.

*Keeler,* 109 Ill. 385, after reiterating the general rule that an attorney will not be allowed to bring his own personal interest into conflict with that which his duty requires him to do on behalf of his client, we said: "We do not, however, understand it to be the law that an attorney is prohibited from purchasing property from his client, where the transaction is fair and honest, and in no manner tainted with fraud, undue influence or corruption. Dealings between attorney and client will be scrutinized closely, in order to guard against wrong being committed, owing to the confidential relations existing between them, and the supposed personal influence of an attorney over his client; but there is no rule of law which absolutely prohibits a sale merely on account of the existence of the relation of attorney and client."

In the present case, as has already been said, the court below found that the appellants, before purchasing the judgment of the appellee, informed her of all her rights and interests and advised her not to sell it. This finding seems to be fully sustained by the evidence. Whitlock, one of the appellants, testifies, that sometime after the judgment was recovered, the appellee came to him and told him that she desired to dispose of it and get some money, as she was proposing to go west; that she asked him if he knew of any person to whom she could apply for money; that he advised her not to dispose of the judgment, and told her she had better keep it, but she insisted that she must have money and would sell it; that he then advised her to see Mr. Drury who lived on an adjoining farm and see if he would buy it, and also advised her to see a Mr. Luken; that she came back and reported that Mr. Drury was not inclined to purchase, but would come up and see the witness; that he came but would offer but $100 which the witness advised appellee not to accept; that she again came to witness' office and said that she had to sell the judgment and would sell it for whatever she could get; that witness told her that while he thought it was not for her interest to sell the

judgment, he and Mr. Morrison would give her $200 for it, and also include court costs and attorneys' fees; that she accepted said offer, and that appellants subsequently paid her the $200 and received from her an assignment of the judgment.

Morrison, the other appellant, testified that he was called into the office where the appellee and Whitlock were talking, and was told by Whitlock that appellee wanted to sell her judgment; that he sat down and had a talk with her about the matter; that she said she was going to Colorado and wanted to sell the judgment to raise money; that he advised her not to do it, and told her he thought it would be worth a great deal more to her if she would keep it; that he talked with her about the management of the farm with her mother, and told her he thought they ought to live on the farm and take care of it; that from all he had heard he did not believe Elmer would redeem it; that she said she would not live on the farm and did not wish to live in Jacksonville, but had made up her mind to go to Colorado, and wanted some money; that the question came up about the amount, and the witness talked with her about the age of her mother, and told her that she could not afford to sell the judgment for what he, the witness, was willing to give for it; that he would not have anything to do with it except upon the basis of the calculation that her mother might live a long life; that her mother had a life estate and the control of the land, and might live twenty-five years; that if she died soon, of course it would be a very great sacrifice, but if she lived a long time—and she was a very healthy woman—it was not a purchase to be desired; that they talked the matter over, the witness explaining to her that a sale under execution would result, as he thought, in obtaining the land, as Elmer would not redeem it, and she replied several times that she did not want the land but wanted the money; that witness finally told her that under the circumstances, he would be willing to pay her $200 and pay the costs, and charge her nothing for services in obtaining the judgment; that she

said she wanted to start in a day or two, and signified her willingness to take the sum offered, and that witness thereupon drew up the assignment and after she had signed it, he went and had it entered on the judgment docket, and then went with appellee to the bank and drew $200 on his firm's check and paid it over to her.

The foregoing testimony is substantially uncontradicted, except so far as it is met by the appellee's testimony that the transaction was a loan and not a sale of the judgment. It would seem to follow necessarily, that the appellants' version of what was said and done at the time the judgment was assigned must be accepted as the true one, especially in view of the fact that the chancellor who saw and heard the witnesses, has so found.

We are of the opinion that the evidence may be fairly held to exonerate the appellants from all charges of unfairness or want of good faith. They seem to have informed, advised and instructed their client fully and fairly as to the nature and extent of the rights and interests which she had obtained or could avail herself of through the instrumentality of her judgment, and counselled and endeavored to persuade her not to sell the judgment, but to hold and use it as a means of acquiring title to her brother's interest in said land. There was no misrepresentation or concealment of any fact, and the influence over their client which the appellants may have possessed growing out of their confidential relations with her, so far as it was exercised at all, was exercised in opposition to her making any disposition of the judgment. Their treatment of her, and their attitude in relation to the proposed transaction were such as placed her in a position where she was able to deal with her attorneys at arm's length, and there can be no doubt that she did so deal with them, and that too wholly upon her own judgment and as the result of her own deliberate choice.

It is true she was a young woman only two years past her majority, and does not seem to have had much business experience.    These facts would doubtless be important if the evidence gave us any intimation of any unfairness or want of good faith on the part of her attorneys.    Her inexperience would only be an additional ground for scrutinizing their conduct with very great closeness and even suspicion.    But as they seem to have exercised towards her perfect fairness and good faith, and to have advised her wisely and judiciously, the consequences of her refusal to be guided by their advice should be visited upon her and not upon them.    She was *sui juris* and legally capable of acting for herself, and only so far as her conduct may have been actually or presumptively influenced by her attorneys, ought they to be held responsible for it.

But it is urged that the price paid by the appellants for said judgment was grossly inadequate, and that the decree should be sustained on that ground.    The sum paid by the appellants, including costs and attorneys' fees, was $275, and whether that sum was inadequate or not must depend upon what is shown to have been the fair cash value of the judgment at the time the assignment was made.    The court below found such value to be equal to the face of the judgment, viz., $716, and the decree was based mainly if not wholly upon the ground of the inadequacy of the price paid.

The judgment is shown to have been a valid and first lien upon an undivided one-fifth interest in the remainder after a life estate in said tract of land, the life tenant then being sixty-one years of age.    The value of an undivided one-fifth of the land, as has already been stated, was from $1600 to $1760, and the mode which seems to have been adopted to ascertain the value of the remainder was, by deducting from the value of the fee the estimated value of the life estate, such estimate being made upon the basis of the probable duration of the life of the tenant, as shown by the tables generally recognized by the courts as authentic.    By such computation

the value of an undivided one-fifth interest in the remainder was shown to be something in excess of the amount of the judgment, and the conclusion was therefore drawn that the judgment was worth its face.

There can be no doubt that for many purposes, the above mentioned mode of determining the relative value of a life estate on the one hand and of the remainder or reversion on the other, may be sufficiently accurate, and may produce just and satisfactory results. Such would be the case where the tenant for life is willing to relinquish his estate and accept in lieu of it a just and equitable proportion of the entire value of the land, but we are of the opinion that, as applied to the facts of this case, it would establish a criterion of value which would be unjust and delusive.

In determining whether property sold has brought an adequate price, the ordinary inquiry is as to its market value. If it is property of a kind frequently bought and sold so as to establish a market price, the question is comparatively free from difficulty. But if there is no established or ascertainable market price, it is proper to inquire as to what purchasers would be likely to give for the property in question, under all the circumstances, if given a fair opportunity for competition. The property sold in this case was a judgment against an insolvent debtor, its only value arising from the fact that it entitled the owner to a specific lien upon an estate in remainder after the termination of a life estate, the life tenant being sixty-one years of age, and apparently in good health. Her life expectancy, as shown by the tables, was some seven or eight years, but the tables furnished no criterion by which it could be ascertained how long she would in fact live. She was of course liable to die at any moment, and there was a possibility that she might live many years beyond the period of expectancy given her by the tables. There were no legal means of extinguishing her title without her consent by paying her the estimated value of her life estate computed accord-

ing to the tables, and while she lived, whether for a longer or shorter period of time, her life estate entitled her to the exclusive possession and enjoyment of the entire tract. It follows that, for all practical purposes, a purchaser of the judgment would obtain, so far as could then be foreseen, an interest of very uncertain value. This element of uncertainty, if not sufficient to deter men from purchasing altogether, would naturally and necessarily have a very depressing effect upon the price which purchasers would be willing to offer. Prudent men, who are usually disposed to deal on the safe side, would be likely, in fixing the price they would be willing to pay, to estimate the probable continuance of the life estate at its extreme limit. Mr. Morrison, in his negotiations with the appellee, only announced a principle upon which most prudent men would have been likely to act, when he told her that he would have nothing to do with it except upon the basis of an expectation that the life tenant would live a long time. There is no evidence upon which to base a finding that the judgment could, at the time, have been sold at its face, or that any other purchaser could have been found who would have been willing to pay a larger or even as large a price as that paid by the appellants, but all the evidence there is on the subject is directly the other way. The appellee was sent by the appellants to other parties to find a purchaser, and the highest offer she was thus able to obtain was $100.

Our conclusion is, that there is no ground for holding that the price paid by the appellants was inadequate; and as they have shown that the transaction was fair and honest on their part, and that they were guilty of no want of fidelity to the interests of their client, we see no reason why the purchase should not be upheld. In our opinion the decree of the court below setting aside the assignment of the judgment and charging the appellants as trustees for the appellee in respect to the lands purchased under the execution is unwarranted by the evidence. The decree will therefore be reversed and the cause

remanded with leave to the parties to introduce additional evidence if they shall so desire and for such further proceedings as shall not be inconsistent with the rules of law as hereinbefore expressed. *Decree reversed.*

SCHOLFIELD and MAGRUDER, JJ.: We dissent from this opinion.